Our next case is number 17-14716, United States v. Priscilla Ann Ellis and Perry Cortez. Mr. Brunvand? Is that the right pronunciation? Yes, Your Honor. Good morning. I'm pleased to court. Bjorn Brunvand on behalf of Priscilla Ellis. As the court knows, I was standby counsel for Ms. Ellis during her trial, and I'm here representing her for purposes of the appeal. Did this trial take place before or after the other one? This trial took place before the other one. Before the other one, okay. The arrest on the other one occurred one week after the verdict on this trial. In this case, okay. That's correct, Your Honor. Thank you. Yes. Your Honor, we've raised five issues in the appeal. The first issue being a sufficiency of the evidence argument, the other issues being sentencing-related issues. And I would rely on the arguments set forth in the brief as it relates to the sufficiency of the evidence argument and would focus at this point on some of the sentencing issues that we believe are important. First of all, the issue as to whether or not the court erred in assessing a two-level enhancement under both United States Sentencing Guidelines 2B1.1B10C and 2S1.1B3 for sophisticated means. Before you dive into those arguments, I think I saw it in the briefs, but I can't recall now. Absent the enhancements that you are objecting to, what was, and I know you have an issue on loss as well, but what, putting the specific offense-related enhancements aside, what were the advisory guidelines based on the loss amount the district court found? So the advisory guideline range, the final advisory guideline range is, I believe, 360 to 480. Right, but if you take away the specific offense enhancements that you're objecting to now and you were just accepting the district court's loss calculation, what would the advisory guidelines have been? I'm trying to make a, get a sense of what sort of a difference it made to have these enhancements. Yes, Your Honor. So for purpose of the sophisticated means, I believe that's a two-level increase, and that would drop it down, I believe, it would drop it down to 292 to 365. I did not do the calculations for purposes of the role and what the number would be as far as where that would drop. The role was three, right, in this case? Right, right. Okay, I'm sorry. Go ahead. I mean, it would be a significant drop, Your Honor. Can you give them a couple of more minutes, please? Thank you. Go ahead. So it's our position that, for example, the sophisticated means enhancement, which basically is included for the fraud and for the money laundering, should not have been included for both. We recognize that there is case law that says it's appropriate. However, we suggest that for the facts in this case, the conduct really was the same, and that therefore if it's included, it should only be included once. We would further suggest that Ms. Ellis and her involvement in this case did not involve sophisticated means. Ms. Ellis, I would respectfully suggest, contrary to the sentencing court's description of Ms. Ellis, that I'm sure everyone has read, I would suggest that she's a very stubborn woman, a very proud woman, someone who genuinely believed that she was the CEO of this Vickens Enterprises, and this was a private worldwide company that was actually real. I mean, and so she's connected with that. I would suggest that there's very little evidence of her actual knowledge of all the different types of schemes that are involved in the case that Mr. Ahmadi, I would suggest, was the primary orchestrator of. And so her involvement really was financial transactions, which I believe she's getting instructions from Ahmadi, and she's getting some guidance from Cortese, her co-defendant, who she believes is her attorney and who's given her legal advice. Clearly there is the incident where Cortese is complaining about the lawyer, I think out of, I can't remember if it's North Carolina, but the one who keeps calling him and wants the money back that was put into the trust account, and Ms. Ellis basically says, block him. And I would suggest that that statement and her communication does not really suggest that she has a grasp of the sophisticated nature of the various schemes. But weren't there shell corporations used and weren't there all sorts of accounts created that were fictitious in nature? Absolutely, absolutely. And you don't think that speaks to the sophisticated nature of the scheme? Well, I would respectfully suggest that they exist. The question is to what degree does Priscilla Ellis have knowledge of it and knowledge of the existence? She's proudly putting herself out there under her own name to this corporation that's receiving and sending money. And so to what degree? Wasn't she receiving money from a fair number of victims that she had no relationship with? Absolutely, absolutely. And as she's representing herself in trial, that's the question she constantly asks the victims when they take the stand. Do you know Priscilla Ellis? Do you know Vic and International and what have you? So it's yes, absolutely, all of those things are taking place. But I would propose that the evidence is not that clear as to what degree she had knowledge or to what degree Miss Ellis was a puppet of sorts of Ahmadi and the people that were above her. It looks like I'm out of time. But anyway, we would ask that you – we would ask – You've saved your time for rebuttal. Thank you, thank you. Thank you very much. Thank you very much. May it please the court, I'm Ryan Truskoski and I'm representing Perry Cortese. So as the court knows, we have a long 13-day jury trial mostly concerning mail and wire fraud. And Mr. Cortese is a lawyer, and it's our position that he did not know what the other conspirators were doing. He was working at Ellis' direction. Well, there came a time over a period of time, it seems to me, where he had a pretty good idea. We would disagree with that. Well, I mean that a jury could find. That a jury could find? Yes, could find that he realized what was going on. Well, we believe that the circumstantial evidence didn't provide enough inferences. I know, that's the argument to the jury. Yes. And the paralegal was doing things too. Well, but as she testified, she thought he was just helping out Mr. Cortese because one of Ellis' wires went bad. Sometimes wires go bad, they just needed another account. You know, Mr. Cortese was essentially an escrow agent. He wasn't obligated to do due diligence on either side of the transaction. He was just told when to transmit money, and that's what he did. But he was significantly involved, whatever you attribute it to. He was significantly involved with the so-called unfreezing of accounts and money, right? Correct. And he was doing that because he thought he was helping the client with complex international transactions, and that's what he was doing. And he thought it was legit. And he never hid his identity throughout all of this. He clearly thought that he had a legitimate client, and as my co-counsel said, she believed she had a corporation. Well, that belief transferred to him, and he bought it too. So he was hoodwinked as well. And, you know— Was there evidence about how he was compensated for his work? Well, his gain was very minimal. I believe that $48,000 was all he made from this $15 million scheme. So it just doesn't make sense. He was doing—that was like a legitimate lawyer fee, basically. That's all he made from all this. He was doing Ellis' bidding, didn't realize what was going on. Was that amount received like per transaction or per account, or was that lump sum or paid regularly, irregularly? Does the record indicate anything about that? The $48,000 I'm speaking of was a lump sum payment. Okay. You know, one of the keys to all this is they didn't seize anything from Mr. Cortese's cell phone or computer. Things were seized from Ellis. So if you look at things in emails and whatnot, the conspirators speak to each other differently than they do when they're speaking with Mr. Cortese, because they believe he's their lawyer, and they speak to him differently. They don't say anything like, oh, we got another mark. Let's go. They say, you know, we need help with this transaction. It's very—you know, it just seems on the up and up. What did—did Samadi have anything to say about Mr. Cortese's role? Who, who? Amati. Amati? I don't—I don't think he testified. There were two co— No, no, in terms of any co-conspirator conversations that might have been introduced involving him. No, not involving Mr. Cortese that I remember. And the two co-conspirators that did testify, Merritt and Nagy, they said they didn't have any kind of conspiracy or agreement with Mr. Cortese. So it's hard to have a conspiracy when everybody's saying there's no conspiracy. So at this point, you rest. All right. Thank you very much. May it please the Court, Linda McNamara for the United States. Good morning. Good morning. Let me just start where we left off with Mr. Cortese's knowledge of the fraud. And I just wanted to start off with something that the district court said at—and when sentencing him. And that is, the evidence aptly describes Cortese as the company lawyer, a pliable, obedient, and appreciative tool for Vickin and the associated criminal network. He stood ready to aid and avidly aided Ellis, Vickin, and the others by exploiting his office as a lawyer to coerce, cajole, reassure, or exploit as needed. That perfectly describes what he did here. And evidence of his knowledge was extensive. Ahmadi referred victims to him when their accounts were being frozen. Ahmadi told them to contact Cortese. He would not have done that if Cortese was not a knowing member of this conspiracy. A lawyer is a person who can blow the whole thing open. But he was the one that victims were referred to. There are times when people who are involved in illegal conduct hire lawyers to do some legitimate work for them. That's not what happened. Right. So what's the difference between a drug organization hiring someone to make sure that something is in order? Let's say an SEC filing is in order for a company that somebody owns, and what happened with Mr. Cortese here? The difference is that the evidence showed that Mr. Cortese knew about the fraud. He had fraud funds running through his trust account. Everything went through the trust account, didn't it? Not everything. I mean, there were many different bank accounts used. As opposed to his business account. Right. That's where it was going. Right. Of course, that's just a pass-through. Correct. You don't charge a fee or get money for putting money in a trust account. Right. Any lawyer knows that. Right. Fraudulently attained funds were flowing through his trust account. He was directing those funds out to accounts in international accounts. The e-mails and the text messages between Cortese and Ellis Cho, he knew what was going on here. He knew bank accounts were being frozen on allegations of fraud. He knew that, and his job was to contact the banks and try to talk them out of freezing these accounts. That's what's his role. He relayed messages from Ahmadi, the head of this organization, to Najee when Najee was in jail, so that he could try to get money out of accounts that Najee knew how to get into. Ahmadi would not have sent him to talk to Najee if he didn't know, if Cortese did not know that he was involved. Was he, according to the evidence the government put on, was Mr. Cortese involved with all of them? There were various different types of schemes within the overall conspiracy, right? So was he involved in some or most or all of those schemes? He was involved in so many of them. I can't say he was involved in all of them, but there is evidence that he knew about, for example, the romance scheme, as we called it in our brief, because he went to collect money from Elsie Green. He was that mysterious man in the white shirt who showed up to collect the money from victim Elsie Green. He knew about the oil rig scheme because he dealt directly with one of the victims of that scheme. That was attorney Charles Griffith. Griffith called Cortese, Ahmadi referred him to the victim, to Cortese, and Charles Griffith did talk to him as well. His trust account was scheduled to receive some of the funds from the Johnstone supply checks, so we can refer from that that he was involved in that as well. He knew about the Joseph Haynes real estate scheme because he received some of the funds from that scheme as well. He knew about Najee's accounts, of course, because, as I said, he visited him in jail to try to get access to those accounts, and he knew how much money was in those accounts because when he went to Najee, he said we need to get access to that $1.5 million that's in that account. Mark Hopkins, Ahmadi referring to himself as Mark Hopkins, referred Cortese Stacy Merritt to him as his attorney. We knew from e-mails from him and Ellis that he knew about the debt collection scheme. I mean, there's evidence on and on, and I could continue, but the evidence is he knew about many, many aspects of the scheme, and much of the money from the scheme was flowing through his account. With respect to how he was getting paid, the bank records showed, and Zony Mullis also testified that some of the money that was flowing through his account, that he was being authorized to keep some of it. Zony Mullis, when she would take out cash, she would deliver it to him. Now, what happened to that cash, we're not sure, but some of the e-mails do indicate that he was being permitted to take a cut of the money that was flowing through his account. Ample evidence of his knowledge here. Now, with respect to the double-counting argument, two things. I think we can say with confidence that none of the guidelines calculations mattered here, because the district court believed that she needed to be imprisoned as long as allowed by law. When sentencing her, the court said, the principal consideration here is to permanently disable Ms. Ellis from the possibility of criminal activity to the maximum extent that we can, short of the death penalty. Now, remember, by this time, she had already been charged with the murder for hire and with committing additional frauds while she was in prison after she had been convicted on these charges. Was there, I want to word this carefully, was there evidence presented either during the trial or at sentencing about Ms. Ellis' role in the murder for hire scheme as that trial had not yet taken place? No, no. I can't say there was evidence of that. The only thing that the court knew was that she had been charged. Charged, right, but there was no evidence put on at that point because that trial had not yet taken place. That was before Judge Moody anyway. Right. Different district judge. Different judges, right. Right, but that hadn't happened yet, so there wasn't any evidence of that. We only had the indictment at that time. But in any event, he neglected to mention that 2B1.1 applies both if the offense involved the use of sophisticated means or if a substantial part of the scheme was committed from outside the United States. And, of course, we had plenty of evidence here that parts of this offense occurred outside of the United States. We had transfers to bank accounts in Belize, Nigeria, China. We know that Amadi, the head of this organization, was in Canada. We have cell phone calls from Ms. Ellis to him. We have text messages between him. And at the time of the trial, Amadi was in Canada as were some of the other members of this organization. So a substantial part of this fraudulent scheme did occur. And, of course, we had Otis also, the one who was making the counterfeit checks. He was in South Africa. So 2B1.1 applied regardless of whether there were sophisticated means. But, of course, there were sophisticated means because of all the layering of all these transactions, because of the use of cell corporations, because of the use of so many different bank accounts, and because of the variety of the fraud schemes. So that enhancement certainly applied anyway. Let me ask you the same question that I asked Mr. Bernvin. Do you know where the guidelines, the advisory guidelines, would have stood without the offense-specific enhancements? I did not do that calculation. No? Okay. But one of the reasons that I didn't is because, honestly, I think the guidelines calculation had nothing to do with what the sentence that was imposed here. Judge Merriday was imposing the statutory maximum sentence for Ms. Ellis regardless of what her guideline calculation was. Right. But I understand what you're saying. But the advisory guideline range matters insofar as you have to gauge the extent of what a variance would have been had the guidelines not been where the district court calculated them to be, right? Well, that is a factor. Right. I don't think it was an important factor. In fact, I think it was a non-issue here with respect to her because she needed to be in prison for as long as possible. That's all. Unless there's any other questions? Thank you very much. Thank you very much. I believe the government is correct that there was no evidence presented at the sentencing in this case referenced the other charge. But I would also suggest that, respectfully, that Judge Merriday certainly was familiar with the allegations and the conduct that was alleged in the other charge. And we specifically know that from Judge Merriday's own words on page 20 of my brief where he states the following, victimizing everyone from perfectly innocent nine-year-old children to her own daughters to those who are closer to her and incomprehensible. The nine-year-old child is a reference to the daughter. A paralegal's daughter. That's correct. That's correct. So clearly the court was aware of that. And respectfully, we would suggest that the guideline range does matter. And I apologize that I didn't do the calculations or bring my chart with me. That's okay. But when the government says it doesn't matter, I think it's important to focus on the words of the sentencing judge and his description of the conduct of my client because I would respectfully suggest that it gives rise to concern about whether or not clearly he is very upset with Ms. Ellis. Clearly he describes her as someone who needs to be removed from society. And the exact language is in my brief. Someone who needs to be punished to the maximum extent short of the death penalty. You don't get that sort of language generally in a white collar case. Correct. You don't normally see it in a white collar case. And it gives a concern as to what degree, to what degree did he consider the 3553 factors of her military history? To what degree did he consider the factors of her actually having operated a barbecue, a nightclub? That she was a single mother. That she had a daughter. He specifically recommends to the prison that she not be allowed to have any contact with her youngest daughter. Her youngest daughter who was a high school student at the time of the arrest and graduated from high school before her mother was sentenced. Those 3553 factors, they had to be considered. And so respectfully we would suggest that maybe they weren't considered as they should have been because of the outrage that the court had and the anger that was present because of the conduct that the court was aware of that takes place just one week after the verdict. Did she represent herself at sentencing with you again as standby counsel? Or did you have more of a role in sentencing? I was standby, Your Honor. There was a breakdown at some point after I told her that she could not repeatedly appeal to the 11th Circuit. Every issue that came up in her case, and I think you'll see from the docket, there's a large number of appeals to the 11th Circuit. Did she, despite her protestation of innocence, did she request a specific range of sentence from the district court when she allocated or made argument below or not? She asked the court to, the exact amount I think is $164,000 or something like that. Right, that's the most amount that she thought that she could have been held responsible for. Right, right. I don't know that she gave a specific sentence that she believed was appropriate. Okay, thank you very much. Thank you, Your Honor. Unless there's any questions, I'll rest on the briefs. Okay, thank you. Mr. Brumbaugh and Mr. Truskoski, again, thank you very much for your service to your clients and to the court. We really do appreciate it. Thank you. Thank you all. Thank you. Our next case is number 18-1.